IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FELISE MAMEA and SIUILA      )      CIVIL NO. 08-00563 LEK
MAMEA,                       )
                             )
          Plaintiffs,        )
                             )
     vs.                     )
                             )
UNITED STATES OF AMERICA,    )
                             )
          Defendant.         )
_____ )

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS
OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant United States of America's ("Defendant") Motion to Dismiss or in the Alternative Motion for Summary Judgment ("Motion"), filed on May 5, 2010. Plaintiffs Felise Mamea and Siuila Mamea (collectively "Plaintiffs") filed their memorandum in opposition on June 9, 2010, and Defendant filed its reply on June 18, 2010. This matter came on for hearing on July 2, 2010. Appearing on behalf of Defendant was Assistant United States Attorney Harry Yee, and appearing on behalf of Plaintiffs was Judith Pavey, Esq. After careful consideration of the Motion, supporting and opposing memoranda, and the arguments of counsel, Defendant's Motion is HEREBY DENIED for the reasons set forth below.

**BACKGROUND**

The instant case arises from the medical care that Plaintiff Siuila Mamea ("Plaintiff Siuila") received at Tripler

Army Medical Center ("TAMC") in 1997.  Plaintiff's kidney problems began in 1995, while she was living in Samoa. [Complaint at ¶¶ 3.1.]  On or about March 14, 1997, TAMC doctors performed a CT scan with contrast to evaluate Plaintiff Siuila's kidneys.  Plaintiffs allege that TAMC performed the scan in violation of the standard of care because TAMC did not hydrate Plaintiff Siuila and flush her kidneys before the scan.  The records from her March 14, 1997 visit also establish a concern for renal stones.  [Id. at ¶¶ 3.3-3.4.]

Plaintiff Siuila was again seen at TAMC on May 3, 1997. Her BUN was twenty-eight and her creatinine level was 4.6.  Her renal ultrasound indicated B/L mod hydronephrosis and nephrolithiasis.  Plaintiff Siuila underwent a cystoscopy on or about May 5, 1997.  TAMC allegedly violated the standard of care by prescribing and giving Plaintiff Siuila 75 mg of Demerol, in light of her elevated creatinine level and the danger of creating toxicity in her nervous system.  On May 6, 1997, Plaintiff Siuila underwent a lithotripsy on her right kidney and a right nephrostomy.  TAMC started her on Ampicillin-Gentamicin. Plaintiffs contend that this was a violation of the standard of care because it increases toxicity.  Plaintiffs also note that TAMC apparently did not test Plaintiff Siuila's kidneys to determine which was most salvageable for purposes of the nephrostomy.  [Id. at ¶¶ 3.4-3.5.]

2

Plaintiff Siuila was again seen at TAMC on or about December 11, 1997 and was given a urine alkalinizing agent to help dissolve the uric acid which was the likely cause of her kidney stones.  Plaintiffs contend that TAMC violated the standard of care by failing to follow up to determine whether the urine alkalization was working.  Plaintiff Siuila was hospitalized at TAMC on or about December 16, 1997.  Upon her discharge, she was instructed, *inter alia*, to drink two to three quarts of fresh fruit juice daily.  Plaintiffs argue that this violated the standard of care because this would acidify her urine, making the uric acid stones worse instead of better.  [<u>Id.</u> at ¶¶ 3.6-3.7.]

Plaintiffs contend that, throughout Plaintiff Siuila's treatment, TAMC violated the standard of care by failing to correctly identify the type of kidney problem that she suffered from.  A proper diagnosis of uric acid stones would have resulted in a course of care that would have salvaged Plaintiff Siuila's kidneys.  Plaintiffs allege that, as a result of Defendant's negligence, Plaintiff Siuila's kidneys had to be removed, and she is currently on dialysis awaiting a transplant.  [<u>Id.</u> at ¶¶ 3.8-3.9.]

Plaintiffs brought the instant action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, alleging a medical malpractice claim on behalf of Plaintiff Siuila and a

loss of consortium claim on behalf of Plaintiff Felise Mamea ("Plaintiff Felise"). [Id. at ¶ 4.3.] Plaintiffs seek: damages to be proven at trial; attorneys' fees and costs; and any other appropriate relief.

In the instant Motion, Defendant first argues that this Court should dismiss the case for lack of jurisdiction because Plaintiffs filed their administrative claim beyond the two-year statute of limitations set forth in the FTCA. In the alternative, Defendant argues that it is entitled to summary judgment because Plaintiff Siuila's failure to seek medical care and her habitual failure to comply with recommended treatments from 1997 to 2005 were the proximate and actual cause of her injuries, not Defendant's alleged breaches of the standard of care in 1997 and 1998.

Defendant argues that Plaintiff Siuila's malpractice claim accrued when she learned of the existence and the cause of her injury. She first learned of her kidney problems when she was treated for kidney stones at the LBJ Tropical Medical Center ("LBJ") on May 3, 1997. Defendant contends that Plaintiff Siuila knew, or should have known, about her injury and the alleged cause claim on September 9, 2003, when she learned that her condition had deteriorated to acute renal failure. Plaintiffs, however, did not file their administrative claim until September 14, 2007, more than two years after the claim accrued. [Motion,

Decl. of Harry Yee ("Yee Decl."), Exh. 14 (Claim for Damage, Injury, or Death).]  The administrative claim lists September 20, 2005 as the accrual date, but this is the date that Plaintiff Siuila began hemodialysis; it does not indicate when she learned that her condition had deteriorated into a more serious condition.

Defendant also argues that it is entitled to a finding that, as a matter of law, TAMC followed the standard of care in treating Plaintiff Siuila's kidney stones.  Plaintiff Siuila's LBJ physicians referred her to TAMC in May 1997 and December 1997 for treatment of kidney stones, and TAMC's diagnosis and treatment of her kidney stones was proper.  Defendant also emphasizes that none of Plaintiff Siuila's medical records indicate that she was suffering from acute renal failure in 1997 and 1998.  Defendant also notes that TAMC provided temporary, symbiotic care to Plaintiff Siuila pursuant to the Pacific Island Health Care Project.  Although this did not diminish TAMC's standard of care, it did limit TAMC's abilities, and patients' expectations, regarding follow-up and long-term care.  After Plaintiff Siuila was last treated at TAMC in January 1998, she returned to the primary care of the LBJ staff.

Plaintiff Felise testified during his deposition that, upon returning to Samoa in May 1997, they were unable to obtain the potassium citrate that was prescribed to Plaintiff Siuila on

her release from TAMC.  [Yee Decl., Exh. 15 (Excerpts of 3/15/10 Depo. of Felise Mamea) at 42-45.]  He also testified that, even though she remained in Hawai`i after December 1997, Plaintiff Siuila stopped taking the medications prescribed to her upon her release from TAMC because Plaintiffs could not afford them.  [Id. at 70.]  Defendant emphasizes that Plaintiff Siuila apparently did not seek medical treatment from January 1998 until September 2003.  On September 9, 2003, at Kaiser Permanente ("Kaiser"), Plaintiff Siuila was diagnosed with "[r]enal failure, likely has a component of acute renal failure, cannot totally exclude an underlying chronic renal disease."  [Yee Decl., Exh. 8 (Kaiser Permanente consultation notes for 9/9/03) at 2.]  In March 2005, Plaintiff Siuila was diagnosed with end stage renal disease and was advised to begin hemodialysis.  Plaintiff Siuila refused. [Yee Decl., Exh. 10 (Kaiser Permanente encounter notes for 4/14/05).]  Plaintiff Siuila continued to refuse dialysis for several months.  [Yee Decl., Exh. 11 (Kaiser Permanente After Visit Summary dated 6/15/05) at 2 ("She was not willing to do dialysis and would prefer to die, but would be amenable to getting a transplant first.  She wasn't willing to use dialysis as a bridge to transplant."), Exh. 12 (Kaiser Permanente notes for 8/26/05 office visit) at 4 (was instructed "Should start dialysis before you get really sick. . . .  At this time you are not a kidney transplant candidate because you have not been

following medical advice, have not been taking your medications as prescribed."), Exh. 13 (Kaiser Permanente Interim Summary dated 9/22/05) at 2 (noting that Plaintiff Siuila refused dialysis on September 17, 2005, but later agreed to begin dialysis).]  Defendant argues that these are just a few examples of Plaintiff Siuila's failure to follow medical advise throughout her treatment for kidney stones and her treatment for renal disease.  Defendant urges the Court to find that Plaintiff Siuila's negligence, and not Defendant's alleged breaches of the standard of care, was the proximate cause of her renal disease and renal failure.

In their memorandum in opposition, Plaintiffs argue that TAMC violated the standard of care by: performing a CT scan with contrast without first hydrating and flushing the kidneys; failing to conduct the necessary tests to determine the cause of Plaintiff Siuila's kidney stones; causing further damage to her kidneys with improper treatment; giving her a toxic antibiotic, Gentamicin, which is known to damage the kidneys, and administering an excessive dose of the drug; failing to have a specialist evaluate her; failing to conduct proper follow-up; discharging her with an inadequate supply of medication; failing to ensure continuity of care with LBJ; and instructing her to drink two to three quarts of fresh fruit juice per day, which was contraindicated for a diagnosis of uric acid stones.  Plaintiffs

assert that Plaintiff Siuila would have followed TAMC's instructions regarding follow-up appointments, tests, and treatments, if TAMC had given her such instructions.  Plaintiffs emphasize that they stayed in Hawai`i on TAMC's advice that, if she needed future medical attention for her kidneys, she would not be able to get it Samoa.

Plaintiff Siuila finally went to Kaiser's emergency room in 2003, but, by that time, the damage to her kidneys was irreversible.  [Mem. in Opp., Decl. of Judith Ann Pavey ("Pavey Decl."), Exh. E (Decl. of Keith L. Klein, M.D., FACP, FASN dated 6/8/10).]  In 2005, Plaintiff Siuila was diagnosed with end stage renal disease and began permanent dialysis three days a week.

Plaintiffs assert that they had no idea that TAMC was responsible for Plaintiff Siuila's kidney failure until the expert investigation into the death of their son.  [Pavey Decl., Exhs. A (Aff. of Mark D. Kamimoto dated 5/28/10), B (Decl. of Siuila Mamea dated 6/6/10), C (Decl. of Siuila Mamea dated 6/8/10), D (Decl. of Felise Mamea dated 6/6/10).]  Plaintiff Siuila states that English is her second language and that she does not understand technical or professional words, sentences, or ideas in English very well.  She also states that she and her husband had never been involved in a lawsuit before this matter.  [Pavey Decl., Exh. C at ¶ 4.]  Thus, Plaintiffs argue that they could not have learned of TAMC's negligence prior to the expert

investigation.  Within months of learning about TAMC's
negligence, Plaintiffs filed their administrative claim.
Plaintiff Siuila's claim did not accrue until she learned of both
her injury and its cause.  Plaintiffs assert that Plaintiff
Siuila did not learn of her injury, complete kidney failure
requiring dialysis for the rest of her life, until September
2005.  When she was discharged from TAMC in 1997, it gave her a
finite amount of medication and assured her that the remaining
kidney stones would break down and that her condition would
improve.  Plaintiff Siuila therefore did not seek treatment again
until she began experiencing extreme pain in 2003.  Plaintiffs
argue that, even if Plaintiff Siuila did not comply with Kaiser's
treatment plan, it is irrelevant to her claim against TAMC
because the damage that TAMC's negligence caused to her kidneys
was already irreversible at that point.  Plaintiffs argue that
their decisions after 2003 do not shield Defendant from the
consequences of TAMC's negligent treatment.

     Plaintiffs argue that Plaintiff Siuila's claim accrued
in 2007 when she learned of the cause of her kidney failure.
Dr. Klein examined her medical records and reported his findings
to Dr. Kamimoto.  [Pavey Decl., Exhs. A-D.]  Prior to that time,
Plaintiff Siuila never suspected that TAMC's treatment caused her
kidney failure, and her Kaiser doctors never suggested such a
connection.  [Pavey Decl., Exh. B at ¶ 4.]  Plaintiffs argue that

Plaintiff Siuila could not reasonably have been expected to know the cause of her injury before her doctors did.  Plaintiffs emphasize that, even if there is a question as to when they knew or should have known of Plaintiff Siuila's claim, the Court must deny the Motion and allow them to present their case at trial.

        Plaintiffs also argue that Defendant is not entitled to summary judgment on the merits of Plaintiff Siuila's malpractice claim.  Plaintiffs have presented declarations from Dr. Klein and Dr. Keiller setting forth the standards of care that TAMC violated and establishing the causative link being those violations and Plaintiff Siuila's injury.  [Pavey Decl., Exhs. E, F (Decl. of Danny L. Keiller, M.D., FACS, MBA dated 6/9/10).] Those declarations clearly establish that, had TAMC treated her properly, Plaintiff Siuila's kidneys would be functional today. Plaintiffs note that Defendant did not address these expert reports in the Motion.  Plaintiffs argue that Defendant's Motion is based on: conclusory statements that TAMC's treatment of Plaintiff Siuila's kidney stones was consistent with the standard of care; speculation about other possible causes of her kidney failure; and reliance on the several years that elapsed between TAMC's treatment and Plaintiff Siuila's kidney failure. Plaintiffs argue that, at most, these assertions raise questions of fact that must be decided at trial.  Plaintiffs also emphasize

that their religious beliefs,[1] subsequent treatment choices, and
the fact that they are originally from Samoa are irrelevant to
this case.

In its reply, Defendant argues that Plaintiff had
actual or constructive knowledge of Plaintiff Siuila's acute
renal failure and its cause as of September 9, 2003 because that
is when her kidney problems developed into a more serious
condition.  Defendant argues that Plaintiff Siuila had some
amount of medical knowledge because she worked as a phlebotomist
at LBJ from 1996 to 1998.  Defendant also emphasizes that
Plaintiff Siuila consistently failed to comply with the
recommended medical care.  These facts support Defendant's
position that she had constructive knowledge of her claim well
before 2007.  Defendant also notes that courts have uniformly
held that a plaintiff's claim accrues when she knows she is
injured, even if she later learns that the injury is permanent.
Further, the fact that her condition later deteriorated,
resulting in a 2005 diagnosis of end stage renal disease, does

---

[1] The Motion quotes a portion of Plaintiff Siuila's medical
record which noted that one of the reasons that she initially
refused dialysis was that Plaintiffs and their extended family
are Mormon and felt that Plaintiff Siuila's pregnancy was a sign
that she was strong and did not need the treatment.  [Mem. in
Supp. of Motion at 13 & n.7 (citing Yee Decl., Exh. 13).]
Defendant also cited a Florida state case for the proposition
that medical providers are not liable where a patient refuses
medical treatment on religious grounds and the refusal results in
injury or death.  [Id. at 13 n.8 (citing St. Mary's Hosp. v.
Ramsey, 465 So.2d 666, 669 (Fla. Dist. Ct. App. 1985)).]

not toll the statute of limitations.

Defendant also emphasizes that the "cause" for statute
of limitations purposes is the immediate physical cause or the
medical cause.  It is irrelevant when the plaintiff learns that
different treatment would have prevented her injury.  Defendant
argues that the immediate medical cause of Plaintiff Siuila's
injury was her failure to seek medical care from 1998 to 2003 and
that she knew of this fact on February 9, 2003.  Thus, Defendant
contends that Plaintiff Siuila's claim accrued on February 9,
2003.  Defendant also reiterates that Plaintiff Siuila's
subjective understanding of the nature of her injury is
irrelevant.  The test for whether Plaintiff Siuila knew or should
have known of the cause of her injury is an objective one; she
must have exercised reasonable diligence in investigating whether
she had a legal claim.

Finally, Defendant argues that Plaintiff Siuila's
declaration that she was unaware of her injury and its cause is
not supported by the record.  The record also contradicts her
claim that she adhered to prescribed treatments and her
physicians' instructions.  Plaintiff Siuila repeatedly failed to
comply with follow-up appointments and refused recommended
dialysis and other treatment.  Defendant also argues that the
record belies Plaintiffs' claim that TAMC abandoned Plaintiff
Siuila, because Plaintiff Felise testified during his deposition

12

that Plaintiff Siuila was seen at TAMC for follow-up in 1998.

[Reply, Suppl. Decl. of Harry Yee, Exh. 26 (Excerpts of 3/15/10

Depo. of Felise Mamea) at 37-38.]   Defendant therefore urges the

Court to disregard Plaintiffs' declarations because they are

self-serving and unsupported by the record.

**STANDARDS**

I.   **Dismissal**

          Defendant seeks dismissal of the instant case for lack

of subject matter jurisdiction.   See Fed. R. Civ. P. 12(b)(1).

> [T]he Ninth Circuit has articulated the standard
> for surviving a motion to dismiss for lack of
> jurisdiction as follows: "When subject matter
> jurisdiction is challenged under Federal Rule of
> Procedure 12(b)(1), the plaintiff has the burden
> of proving jurisdiction in order to survive the
> motion.   A plaintiff suing in a federal court must
> show in his pleading, affirmatively and
> distinctly, the existence of whatever is essential
> to federal jurisdiction, and, if he does not do
> so, the court, on having the defect called to its
> attention or on discovering the same, must dismiss
> the case, unless the defect be corrected by
> amendment."   Tosco Corp. v. Communities for a
> Better Env't, 236 F.3d 495, 499 (9th Cir.2001)
> (citations and internal quotations omitted).
>           A Rule 12(b)(1) challenge to subject matter
> jurisdiction can be "facial," in which case the
> Court assumes the plaintiff's factual allegations
> to be true and draws all reasonable inferences in
> its favor.   Doe v. See, 557 F.3d 1066, 1073 (9th
> Cir.2009).   Or, the motion may be a "factual" or
> "speaking" motion, where the movant may submit
> materials outside the pleadings to support its
> motion.   In that case, "[i]t then becomes
> necessary for the party opposing the motion to
> present affidavits or any other evidence necessary
> to satisfy its burden of establishing that the
> court, in fact, possesses subject matter
> jurisdiction."   Colwell v. Dep't of Health and

> Human Servs., 558 F.3d 1112, 1121 (9th Cir.2009).
> "If the court determines at any time that it lacks
> subject-matter jurisdiction, the court must
> dismiss the action."  Fed.R.Civ.P 12(h)(3).

Native Vill. of Kivalina v. ExxonMobil Corp., 663 F. Supp. 2d

863, 870-71 (N.D. Cal. 2009) (some citations and quotation marks

omitted) (alterations in original).  In a "factual" motion to

dismiss,

> [w]here the jurisdictional issue is separable from
> the merits of the case, the district court is free
> to hear evidence regarding jurisdiction and to
> rule on that issue prior to trial, resolving
> factual disputes where necessary.  Augustine v..
> United States, 704 F.2d 1074, 1077 (9th Cir.1983);
> Thornhill [Pub. Co. v. Gen. Tel. & Elec. Corp.],
> 594 F.2d [730,] 733 [(9th Cir. 1979)].  "In such
> circumstances '[n]o presumptive truthfulness
> attaches to plaintiff's allegations, and the
> existence of disputed material facts will not
> preclude the trial court from evaluating for
> itself the merits of jurisdictional claims.'"
> Augustine, 704 F.2d at 1077 (quoting Thornhill,
> 594 F.2d at 733).

Pub. Lands for the People, Inc. v. U.S. Dep't of Agric., No. CIV.

S-09-1750 LKK/JFM, 2010 WL 3069934, at *4 (E.D. Cal. Aug. 5,

2010).  If the jurisdictional issue is so intertwined with the

plaintiff's substantive claims that resolution of the

jurisdictional issue will require deciding factual issues that

will affect the merits of the case, the court should reserve

ruling on the jurisdictional issue until the facts have been

decided either in a motion addressing the merits of the case or

at trial.  See Augustine, 704 F.2d at 1077.

14

## II.  **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex [Corp. v. Catrett], 477 U.S. [317,] 323 [(1986)].  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller [v. Glenn Miller Prods., Inc.], 454 F.3d [975,] 987 [(9th Cir. 2006)].

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving

party may not rely on the mere allegations in the
pleadings and instead "must set forth specific
facts showing that there is a genuine issue for
trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d
885, 891 (9th Cir. 2005) (quoting <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).
"A genuine dispute arises if the evidence is such
that a reasonable jury could return a verdict for
the nonmoving party." <u>California v. Campbell</u>, 319
F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred
Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000)
("There must be enough doubt for a 'reasonable
trier of fact' to find for plaintiffs in order to
defeat the summary judgment motion.").
         On a summary judgment motion, "the nonmoving
party's evidence is to be believed, and all
justifiable inferences are to be drawn in that
party's favor." <u>Miller</u>, 454 F.3d at 988
(quotations and brackets omitted).

<u>Rodriguez v. Gen. Dynamics Armament & Technical Prods., Inc.</u>, 696
F. Supp. 2d 1163, 1176 (D. Hawai`i 2010) (some citations
omitted).

**DISCUSSION**

I.   **Statute of Limitations**

         Under 28 U.S.C. § 2401(b),[2] claimants are required to
submit their administrative claims within two years after the
claims accrued.  A medical malpractice claim[3] brought under the

---

         [2] Section 2401(b) states, in pertinent part: "A tort claim
against the United States shall be forever barred unless it is
presented in writing to the appropriate Federal agency within two
years after such claim accrues . . . ."

         [3] Plaintiff Felise asserts a claim for loss of consortium.
[Complaint at ¶ 4.3.]  This claim is derivative of Plaintiff
Siuila's claim for medical malpractice.  <u>See</u> <u>Leslie v. Estate of
Tavares</u>, 91 Hawai`i 394, 403-04 n.11, 984 P.2d 1220, 1229-30 n.11
(1999) (citing <u>Tabieros v. Clark Equip. Co.</u>, 85 Hawai`i 336, 361,
                                                      (continued...)

FTCA accrues when the plaintiff discovers, or should have discovered with reasonable diligence, the existence of her injury and its cause.  See United States v. Kubrick, 444 U.S. 111, 119-22 (1979); Hensley v. United States, 531 F.3d 1052, 1056 (9th Cir. 2008).  Where the plaintiff alleges a failure to properly diagnose or treat, the injury is the development of the problem into a more serious condition.  See Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983) ("Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, . . . the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." (emphasis in original)).  If a plaintiff fails to comply with the requirements of § 2401(b), the district court lacks jurisdiction over the FTCA action.  See id. at 1077.

This Court agrees with Defendant that Plaintiff Siuila

---

[3](...continued)
944 P.2d 1279, 1304 (1997) (noting that, "[u]nder Hawai`i law, a spouse's claim of emotional distress, based on an injury to her husband, is a 'derivative' claim sounding in tort" (citations omitted))).  If Plaintiff Siuila cannot recover for her claim, whether based on a lack of jurisdiction or on the merits of her claim, Plaintiff Felise is likewise precluded from recovery.  See Omori v. Jowa Hawai`i Co., Ltd., 91 Hawai`i 146, 146-47, 981 P.2d 703, 703-04 (1999) ("The majority rule is that a plaintiff in a [derivative-injury tort] action can only recover if the tortious harm the [injured party] suffered would have entitled the [injured party] to maintain an action against the defendant." (citation and quotation marks omitted) (alterations in original)).

discovered her injury on September 9, 2003, when she learned that
her previously diagnosed condition, kidney stones, had
deteriorated into a more serious condition, acute renal failure.
The Court rejects Plaintiffs' contention that Plaintiff Siuila
discovered her injury in September 2005 when she learned that her
kidneys had failed and that she required life-long dialysis
treatment.  [Mem. in Opp. at 10.]  Nor did she discover the
injury in March 2005, when she learned that she had end stage
renal disease and that dialysis was recommended, but optional.[4]
See Raddatz v. United States, 750 F.2d 791, 796 (9th Cir. 1984)
("a claim does not wait to accrue until a party knows the precise
extent of an injury" (citing Ashley v. United States, 413 F.2d
490, 493 (9th Cir. 1969))).  That, however, does not end the
inquiry.

        Defendant argues that Augustine stands for the
proposition that a claim for the failure to properly diagnose or
treat an ailment "accrues when the medical problem develops 'into
a more serious condition which poses a greater danger to the
patient or which requires more extensive treatment.'"  [Mem. in
Supp. of Motion at 5 (quoting Augustine, 704 F.2d at 1078).]  In
Defendant's view, a plaintiff's knowledge that she has developed

---

        [4] Plaintiff Siuila was hospitalized from March 24 to March
26, 2005.  She was advised to start dialysis, but she refused.
[Yee Decl., Exh. 10 at 3.]  She continued to refuse dialysis
until sometime during September 2005.  [Yee Decl., Exhs. 11-13.]

a more serious condition constitutes knowledge of both the injury and the cause.  Defendant's position is inconsistent with the text of <u>Augustine</u>, in which the Ninth Circuit stated:

> When a physician's failure to diagnose, treat, or warn a patient results in the development of a more serious medical problem than that which previously existed, <u>identification of</u> **<u>both</u>** <u>the injury and its cause</u> may be more difficult for a patient than if affirmative conduct by a doctor inflicts a new injury.  Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state.  Rather, **<u>the injury</u>** <u>is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment</u>.  In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b).
>
> The government argues that because Augustine was aware of the bump on his palate at the time the Air Force dentists failed to diagnose or treat the bump, he was aware of his injury at that time.  However, **<u>the injury</u>** <u>alleged by Augustine is not the bump on his palate but the *development* of the bump from a controllable medical condition into incurable metastatic cancer</u>.
>
> The issue of accrual in this case thus depends upon when and if plaintiff discovered or through the exercise of reasonable diligence should have discovered that the failure of his doctors to diagnose, treat, or warn him led to his deteriorating physical condition.

704 F.2d at 1078 (citation omitted) (some emphases added).  Thus, <u>Augustine</u> does not support Defendant's position that a

plaintiff's claim for the failure to diagnose or treat accrues as soon as she learns that her condition has developed into a more serious condition.

Plaintiff Siuila's claim did not accrue until she also knew, or should have known through the exercise of reasonable diligence, the cause of her injury.  The "should have known" standard "looks not to the likelihood that a plaintiff would in fact have discovered the cause of his injury if he had only inquired, but instead focuses on whether the plaintiff could reasonably have been expected to make the inquiry in the first place." Rosales v. United States, 824 F.2d 799, 804 (9th Cir. 1987) (citation and quotation marks omitted).  Defendant argues that Plaintiff Siuila's claim accrued on September 9, 2003, when she learned that she had acute renal failure, because none of her treating physicians ever identified her treatment at TAMC as a cause of her acute renal failure.  [Reply at 11.[5]]  Defendant's argument is misplaced.

The Ninth Circuit has held that "[w]here 'not even the doctors knew of the probable general medical cause,' . . . an FTCA medical malpractice claim does not accrue." Winter v. United States, 244 F.3d 1088, 1091 (9th Cir. 2001) (quoting

---

[5] The reply refers to an accrual date of February 9, 2003. At the hearing on the Motion, Defendant's counsel stated that such references were in error and should have read September 9, 2003.

Rosales, 824 F.2d at 805).   In Winter, the plaintiff, Steven

Winter, participated in experimental program for paraplegics

conducted by the Veterans' Affairs ("VA") Center in Cleveland,

Ohio.  Dr. E.B. Marsolais was the director of the program.

Between 1983 and 1986, the VA implanted a series of electrodes in

Winter's legs in an attempt to restore his ability to walk.   In

1989, Winter was hospitalized with cellulitis, an infection in

his left leg.   The infections became more severe in 1994, and in

July 1994 Winter filed an administrative claim with the VA,

alleging that the negligent operation of the electrode program

caused his injuries.   See id. at 1089-90.   In affirming the

district court's ruling that Winter's claim did not accrue prior

to July 21, 1992, the Ninth Circuit stated:

> At no point did any doctor tell Steven Winter that
> the electrodes implanted by Dr. Marsolais caused,
> or might have caused, his cellulitis.  When Winter
> suggested in 1989, based on his lay suspicion,
> that the electrodes might have been causing
> problems, he was clearly told that the electrodes
> were not the cause of his infection.   The
> specialist Winter consulted, Dr. Kadakia, relied
> on the information provided by Dr. Marsolais, a
> leading authority on electrode implantation and
> the very doctor who implanted the electrodes.
> Dr. Kadakia assumed that this information was
> valid and credible, and elected not to perform
> surgery on Winter.  Yet the government asks us to
> hold that Winter, a layman with no medical
> knowledge, knew or should have known the cause of
> his injuries at this point, despite the
> uncertainty of Winter's own treating physician, a
> specialist in this area who had apparently
> rejected the electrodes as a possible cause.

Id. at 1091.

        In Rosales, the plaintiffs filed an administrative

claim on July 9, 1984 alleging, *inter alia*, that their infant

daughter, Victoria, suffered various injuries, including brain

damage and vision problems, as a result of military medical

personnel's negligence in failing to locate the intrauterine

device ("IUD"), which Mrs. Rosales informed them she had, and in

failing to inform her of the dangers associated with continuing a

pregnancy with an IUD once they discovered that the IUD was still

in place.  See 824 F.2d at 801-02.  The government argued that

the claim accrued at Victoria's birth on March 7, 1982 because a

doctor informed Mrs. Rosales in December 1981 that an IUD could

cause complications to a pregnancy and Victoria was born

premature with a lazy lid.  See id. at 803.  The Ninth Circuit,

however, noted that "[p]atients may reasonably rely on assurances

by physicians that complications are normal and do not indicate

that an actual injury has occurred." Id. at 804 (citing Raddatz,

750 F.2d at 796; Simmons v. United States, 805 F.2d 1363, 1368

(9th Cir. 1986)).  After Victoria's birth, doctors assured the

Rosaleses for several months that her lazy lid was temporary and

that there was no injury.  See id.  The Ninth Circuit further

noted that

                the undisputed materials in the record show that
                the Rosaleses did not know, and reasonably should
                not have known, of the *cause* of Victoria's injury
                until well after July 9, 1982.  The government
                does not dispute the plaintiffs' assertion that
                Dr. Fowler did not mention to them in or before

                                    22

> September 1982 that the IUD might have caused the
> suspected retardation.  Indeed, in September 1982
> Dr. Fowler himself had not been able to diagnose
> the cause of the retardation.  His letter of
> September 9 to Dr. Lytle, the physician at the El
> Toro clinic, stated: "The etiology of the
> encephalopathy is uncertain.  One consideration
> would be an intrauterine infection."  Ordinarily,
> a plaintiff cannot be expected to discover the
> general medical cause of his injury even before
> the doctors themselves are able to do so.

Id. at 804-05 (citation omitted) (emphasis in original).  The

Ninth Circuit therefore reversed the district court's dismissal

of the claims for Victoria's injuries, holding that the Rosaleses

filed their administrative claims within two years of their

accrual.  See id. at 805-06.

In the instant case, Plaintiffs filed their

administrative claim on September 14, 2007.  Thus, in order for

Defendant to prevail, Plaintiffs' claims must have accrued

between September 9, 2003, when Plaintiff Siuila learned of the

existence of her injury, and September 13, 2005, two years and

one day before Plaintiffs filed their administrative claim.

During that time, however, none of Plaintiff Siuila's doctors

concluded that the treatment she received at TAMC in 1997 was the

cause of her injury.  According to Plaintiff Siuila's

December 16, 1997 TAMC Discharge Summary, her condition was

stable and she was to: follow up with Dr. Thibault in the Urology

23

Clinic on December 19, 1997;[6] return prior to her follow-up appointment if she developed fever or severe pain, or had pus or severe bleeding from the incision site; use "T3 as needed for pain, every 4-6 hours"; and drink two to three quarts of fresh fruit juice and water. [Yee Decl., Exh. 7 (Discharge Summary dated 12/16/97) at 3.] Plaintiff Siuila states that, because TAMC did not give her instructions for on-going monitoring, testing, or medication, she believed that she did not need to be concerned about her condition unless the pain returned.[7] Her pain returned in September 2003, and she learned that she had acute renal failure, but her condition was managed by the treatment she received at Kaiser. Plaintiff Siuila again experienced severe pain in 2005 and eventually agreed to dialysis. [Pavey Decl., Exh. C at ¶¶ 8, 11-12.] As Defendant concedes, none of Plaintiff Siuila's treating physicians ever identified the treatment that she received, or did not receive, at TAMC as the cause of her acute kidney disease or her eventual

---

[6] The Court cannot determine from the record before it whether she went to that appointment.

[7] The Court notes that Plaintiffs state in their memorandum in opposition that, upon her discharge, the TAMC staff assured Plaintiff Siuila that her remaining kidney stones would break down and that her condition would improve. [Mem. in Opp. at 10.] This would be relevant to the issue when Plaintiff Siuila could have been reasonably expected to discover her injury. See Rosales, 824 F.2d at 804 (plaintiff reasonably relied on doctor's assurances that condition was temporary and that there was no injury). Plaintiffs, however, did not identify any declaration or exhibit where this testimony can be found.

end stage renal failure.  Plaintiff Siuila cannot reasonably be expected to discover the medical cause of her injury before her doctors were able to do so.  See Winter, 244 F.3d at 1091; Rosales, 824 F.2d at 805.

Plaintiff Siuila's injury is not the type of *res ipsa loquitur* injury where the mere fact that the injury exists can support a finding of negligence, such as a scalpel that is discovered inside of a patient's body after surgery.  See Hawkins v. United States, No. 1:04-cv-05771-GMS, 2010 WL 2720956, at *2 (E.D. Cal. July 8, 2010) (citing Flowers v. Torrance Mem'l Hosp. Med. Ctr., 8 Cal.4th 992, 1001, 35 Cal.Rptr.2d 685, 884 P.2d 142 (1994)).  If that were the case, she could reasonably have been expected to inquire into the cause of her injury immediately upon learning of its existence.  Further, there is nothing in the existing record, whether in the course of her treatment or otherwise, which establishes that Plaintiff Siuila could reasonably have been expected to inquire into why her kidney problems became more serious between September 9, 2003 and September 13, 2005.

This Court cannot find based on the existing record that Plaintiff Siuila's medical malpractice claim accrued prior to September 14, 2005.  The Court therefore FINDS, based on the existing record, that Plaintiffs' administrative claim was timely filed.  Defendant's Motion is DENIED WITHOUT PREJUDICE to the

25

extent that it seeks dismissal this action for lack of subject matter jurisdiction.

## II.   **Medical Malpractice Claim**

In the alternative, Defendant argues that it is entitled to summary judgment on the merits of Plaintiff Siuila's medical malpractice claim because TAMC personnel followed the standard of care in treating Plaintiff Siuila, and because Plaintiff Siuila was negligent in not complying with her treatment plans.

In negligence actions brought under the FTCA, the United States is liable only where a private person would be liable for the same act or omission under the laws of the state within which the act or omission occurred.  See 28 U.S.C. §§ 1346(b)(1),[8] 2674.  Under Hawai`i law, a plaintiff in a medical

---

[8] Section 1346(b)(1) states, in pertinent part:

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The United States, however, cannot be held liable for prejudgment interest or punitive damages.  See 28 U.S.C. § 2674.

malpractice case must establish that: the defendant owed a duty to the plaintiff; the defendant breached that duty; and there is a causal relationship between the defendant's breach and the plaintiff's injury.  See Bernard v. Char, 79 Hawai`i 371, 377, 903 P.2d 676, 682 (Ct. App. 1995).  Hawai`i courts generally require expert medical testimony to establish negligent treatment because "'lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient.'"  Id. (citations omitted).  Further, the expert cannot merely testify that he would have treated the patient in a particular manner; the expert must testify "that the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession."  Id. (citations omitted).

Defendant cites the declaration of Major (Dr.) Nealanjon P. Das as support for its positions that TAMC followed the standard of care in Plaintiff Siuila's treatment and that she was the one who was negligent.  [Motion, Decl. of Major (Dr.) Nealanjon P. Das ("Das Decl.").]  Major Das is the Acting Chief of Nephrology at TAMC.  He was not Plaintiff Siuila's treating physician, and he did not participate in her care.  [Id. at ¶¶ 1-3.]  Major Das states that the Urorisk test that TAMC performed

27

on Plaintiff Siuila in May 1997 "is a widely accepted laboratory diagnostic study utilized by nephrologists and urologists to guide the management of recurrent stone disease." [Id. at ¶ 5.] He also states that, based on her Urorisk profile, TAMC "prescribed medically indicated and appropriate medication therapy." [Id. at ¶ 6.] Major Das asserts that Plaintiff Siuila was "repeatedly noncompliant with her providers' medical treatment recommendations and plan" by: discontinuing the medication prescribed to her in 1997; failing to return to Kaiser, as instructed, for continued care of her kidney disease after her 2003 diagnosis; and refusing medically advised care, such as the need to undergo dialysis. [Id. at ¶ 16.] He states: "Long-term patient noncompliance could lead to the development of more kidney stones, with progressive kidney failure over time, and [end stage renal disease]." [Id.] Further,

> Failure to begin dialysis when medically indicated and urged, may place a patient at increased risk of the complications associated with progressive untreated renal failure, as well as death. [Plaintiff Siuila's] failure to adhere to timely initiation of hemodialysis – as was medically indicated and advised by multiple physicians on multiple occasions – may have potentially led to chronic diseases of the bone, brain, nervous system and heart as well as malnutrition.

[Id. at ¶ 17.] Major Das identified three other factors that may have contributed to Plaintiff Siuila's chronic kidney disease and eventual development of end stage renal disease: morbid obesity;

smoking until approximately 1997 to 1998; and regular use of non-steroidal anti-inflammatory medications.  All of these pose risk factors for progressive kidney disease.  [Id. at ¶ 18.]

Plaintiffs submitted reports by their experts, Keith L. Klein, M.D., FACP, FASN,[9] and Danny L. Keiller, M.D., FACS, MBA.[10] Dr. Klein opines that TAMC "violated the standard of care in several respects which caused the failure of [Plaintiff Siuila's] kidneys."  [Klein 3/29/10 Report at 5.]  These include, *inter alia*: performing a CT scan with contrast before Plaintiff Siuila's kidneys had been hydrated and flushed; prescribing both Demerol and Gentamicin; failing to perform appropriate tests to determine the type of kidney stones she had and their cause; failing to conduct follow-up.  [Id. at 5-6.]  He opines that, by the time Plaintiff Siuila sought treatment at Kaiser, it was not possible to salvage her kidneys.  [Id. at 7.]  Further, he states: "to a reasonable degree of medical probability or certainty it is my opinion that the care and treatment, or lack thereof, rendered by [TAMC] as outlined herein was the proximate cause of [Plaintiff Siuila's] kidney failure and the need for

---

[9] Dr. Klein's March 29, 2010 report ("Klein 3/29/10 Report") and his June 3, 2010 rebuttal report ("Klein 6/3/10 Report") are Attachments 1 and 2, respectively, to his June 8, 2010 declaration, which is Exhibit E to the Pavey Declaration.

[10] Dr. Keiller's March 26, 2010 report ("Keiller 3/26/10 Report") is Attachment 1 to his June 9, 2010 declaration, which is Exhibit F to the Pavey Declaration.

dialysis." [Id.]  Had TAMC properly diagnosed her kidney stones

as being related to uric acid and provided appropriate treatment,

Plaintiff Siuila would not have lost her kidney function.  [Id.

at 8.]  Dr. Keiller gave similar opinions regarding the care that

Plaintiff Siuila received at TAMC, and he ultimately opined that:

> Severe renal damage caused by medical negligence
> as outlined herein by LBJ Hospital and [TAMC]
> caused severe damage to [Plaintiff Siuila's]
> kidneys necessitating chronic hemodialysis and the
> need for a kidney transplant.  Chronic renal
> failure reduces her life expectancy significantly
> and causes great personal hardship for her as she
> undergoes hemodialysis on a regular basis and/or
> transplantation.

[Keiller 3/26/10 Report at 4.]

Viewing the record in Plaintiffs' favor, this Court

FINDS that they have set forth specific facts showing that there

are genuine issues for trial regarding whether TAMC violated the

standard of care during Plaintiff Siuila's treatment and whether

any negligence on Plaintiff Siuila's part contributed to her

injury.  Defendant's Motion is therefore DENIED WITHOUT PREJUDICE

to the extent that it seeks summary judgment on the merits of

Plaintiff Siuila's medical malpractice claim and on the merits of

Plaintiff Felise's derivative loss of consortium claim.

## CONCLUSION

On the basis of the foregoing, Defendant's Motion to

Dismiss or in the Alternative Motion for Summary Judgment, filed

May 5, 2010, is HEREBY DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, August 23, 2010.



    /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge

**FELISE MAMEA AND SIUILA MAMEA V. USA; CIVIL NO. 08-00563 LEK; ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**